**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Alexander D. Neigum, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER RE MOTION TO COMPEL** |
| | ) | |
| vs. | ) | |
| | ) | |
| BNSF Railway Company, a corporation, | ) | |
| | ) | Case No.: 1:06-cv-026 |
| Defendant. | ) | |

_____

## I.    BACKGROUND

In this FELA action, Plaintiff Alexander Neigum is suing defendant BNSF Railway Company ("BNSF") for injuries allegedly sustained while employed as an engineer for the BNSF. Plaintiff claims that he injured his back when he attempted to open a door on the cab of a locomotive in preparation for taking a train from Mandan, North Dakota to Glendive, Montana on February 6, 2004.  Plaintiff claims that the door was stuck and that he wrenched his back while attempting to open it.

Plaintiff reported his injury to BNSF personnel when he completed his trip.[1]  As a result of his report, another engineer at Glendive was requested to inspect the locomotive and he submitted a brief written report several days later that stated he had no problems in opening the door, although there may be some dispute as to what he may consider to be a problem.  Plaintiff indicates that the conductor on the train who accompanied Plaintiff will confirm in some fashion that the door was sticking and hard to open.

_____

[1]  There is some indication that Plaintiff took the train only so far as Dickinson, North Dakota, before his allotted time ran out and that the someone else took the train on to Glendive.

Because of the injury claim, the engine in question was inspected by a three person inspection team in Denver, Colorado on February 10, 2004. The written report from the inspection sets forth the following findings:

> Front Door - Regular amount of effort to open + close, rubber seal appears to grab, also someone has applied foam weather stripping on the door jam

The portion of the report that indicates what repairs were made states: "spray silicone lub. on seal, removed the addition foam weather stripping."

Since the February 10, 2004, inspection, the engine has been in more or less continuous use all over the western half of the United States including the states of North Dakota, Montana, Washington, Idaho, Oregon, New Mexico, Arizona, Texas, Louisiana, Oklahoma, Colorado, Kansas, Nebraska, Iowa, Minnesota, Wisconsin, Illinois, Missouri, and Tennessee. During this period, the engine has been inspected on an almost daily basis. And, as would be expected, the computer printout that summarizes the maintenance work and repair that has been performed on the engine since February 10, 2004, goes on for pages.

This action was filed on March 28, 2006. It is now scheduled for trial on April 21, 2008, and by the time of trial will have been pending for slightly more than two years.

Pursuant to the court's initial scheduling orders, the trial was originally set for August 20, 2007, and Plaintiff's disclosure of his expert reports was due March 5, 2007. By stipulation of the parties that was accepted by the court, the deadline for disclosure of Plaintiff's expert reports was extended to April 15, 2007. That date has never been changed.

While the exact date is not known, it appears that sometime in February or March 2007, Plaintiff's counsel made a formal request to BNSF for inspection of the engine by Plaintiff's expert and asked that it be scheduled in sufficient time to allow Plaintiff to meet his expert disclosure

deadline.  BNSF objected to the request on April 2, 2007, for a number of reasons, but primarily

because, in its view, an inspection would be pointless given the passage of time and the alteration

that was made during the inspection of  February 10, 2004, and the cost and expense of taking the

engine out of service and everyone having to attend outweighed any benefit.  At that point, Plaintiff

proceeded with his expert disclosure without the inspection.

Plaintiff's liability expert opined in his report that the door was defective because it was

sticking, that this   was an   unsafe condition in violation of Locomotive Safety Standards

promulgated at 49 C.F.R. § 229.45, and that the engine should not have been in use at the time of

the accident.  He also concluded that  BNSF was negligent in its failure to identify and remedy the

defective cab door prior to Plaintiff suffering his injury.

For purposes of the present discovery dispute, it is important to note that Plaintiff's expert

did not attempt to identify the precise cause of the sticking door beyond the problems he perceived

as having been recognized in the February 10, 2004, inspection report, *i.e.*, that the rubber seal was

"grabbing" and that the someone had placed foam weather stripping on the door jam that was

removed.  As to the weather stripping, Plaintiff's expert opined: "The foam weather stripping was

so located that it could become wedged between the door and the door jamb."  Plaintiff's expert's

ultimate conclusion was that the door in its sticking condition was defective and a violation of the

Locomotive Safety Standards "[r]egardless of the cause for the failure of the door to operate as

intended. . . ."    There is nothing in his expert witness disclosure that suggested a necessity for

further developing the actual cause of the door sticking, much less a need to identify whether there

was some other mechanical cause.

Plaintiff's attorney raised the issue of BNSF's objections to an inspection during a May 18, 2007, conference call that the undersigned conducted in this action and in another FELA action in which the same attorneys had pending discovery disputes. Under the standing order issued in this action and the other action, the attorneys were required to have a phone conference with a magistrate judge prior to filing any discovery motions.

During the May 18, 2007, phone conference, which lasted more than two hours, no resolution was reached regarding the dispute over the inspection of the engine in part because the primary focus of the call was the numerous discovery disputes in the other case, which was scheduled for trial first; in part because the court at the parties request continued the trial of the present action to April 21, 2008 - an extension of eight months - when it was apparent the parties could not be ready; and in part because it appeared the parties still might be able to resolve the issue.[2] The court's recollection is that Plaintiff's attorneys were advised to proceed with a written motion if the matter could not be resolved.

As a result of the trial being continued, the court ordered the parties to submit a revised scheduling and discovery plan. Pursuant to the court's order, the parties stipulated to a revised discovery schedule, which the court approved on July 17, 2007. The stipulation gave the parties: until February 1, 2008, to complete fact discovery and file discovery motions; until February 18, 2008, to file dispositive motions; and until March 14, 2008, to complete discovery depositions of the expert witnesses. No specific mention was made in the stipulation executed by Plaintiff's

---

[2] One of the primary concerns expressed during the May 18, 2007, phone conference by Plaintiff's counsel was BNSF's attorney cross-examining Plaintiff's liability expert, and otherwise arguing to the jury, about the fact he had never personally inspected the door. During the phone conference, the court suggested that, if this was the primary reason for the inspection, the parties might be able to resolve it by agreeing to restrict their questioning and argument and save all of the trouble and expense.

counsel of altering or extending the deadlines for disclosure of expert opinions, which had already been completed by the time the stipulation was executed by counsel.

Also, in the many months that have followed, no motion for an extension of the expert disclosure deadline date has been made by Plaintiff's counsel. Further, there is nothing in BNSF's expert disclosures that would have triggered a need for the development of further expert testimony. BNSF's liability expert has not examined the door, and will not be examining the door prior to trial according to BNSF's counsel, consistent with the view that any examination of the door at this late date would be of no practical value. From what the parties have described, the scope of BNSF's liability expert's testimony is that a sticking door is not a violation of any federal law or safety regulation and that Plaintiff should simply have been more careful.

Apparently, in late August 2007, and after several months lapse in time from the May phone conference, Plaintiff's counsel again raised the issue of the inspection with BNSF's attorney. BNSF's attorney responded with a letter dated September 5, 2007, stating, essentially, that BNSF continued its objections to the inspection. Nevertheless, it appears that the discussion regarding a possible inspection continued and that BNSF's attorney indicated he would attempt to locate the locomotive and determine the cost of taking it out of service for inspection by Plaintiff, but that BNSF was still objecting to the relevancy and the necessity for the inspection. Finally, on December, 10, 2007, BNSF's attorney faxed a letter to Plaintiff's attorney stating that the engine, which had been all over the western United States, was now in the immediate region and could be spotted at Mandan, North Dakota, on Friday December 14, 2007, for inspection, subject to a number of conditions including the payment of the costs of taking it out of service, which costs were yet to be determined.

Plaintiff's attorney responded on December 11, 2007, stating his expert was not available on such short notice, and suggested dates in the middle of January 2008 as well as the last week of January and the first week of February, even if the inspection would have to take place elsewhere. He also indicated that he objected to the conditions placed on the examination including reimbursement of the costs of taking the engine out of service and the condition that Plaintiff could not be present. When Plaintiff's attorney advised that his expert was not available on that Friday, BNSF's attorney indicated he would seek to hold the engine in place over the weekend for a day or two. Plaintiff's attorney did not respond to that suggestion.

On December 21, 2007, Plaintiff's attorney contacted the undersigned seeking another telephone conference to discuss the discovery dispute. The court conducted an on-the-record telephone conference on January 9, 2007, which was the first date the attorneys were both available. The court ordered that the material forwarded to the undersigned by both parties be docketed and treated as Plaintiff's motion to compel and BNSF's response. In addition, the undersigned gave both parties an opportunity to argue their positions, as well as submit any additional information in writing that they deemed necessary. Neither party requested the opportunity to make additional filings and both consider the existing record sufficient to resolve the issue.

## II.     DISCUSSION

Parties are entitled to discovery of matters "relevant to the subject matter involved in the action," and the "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); see Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). This includes inspection of physical objects that are the subject matter of the litigation. See Fed. R. Civ. P. 34.

All discovery, however, is subject to the provisions of Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii), which provide that the court may limit the frequency and use of discovery methods otherwise permitted  based upon the following:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

In this case, BNSF's primary objection to the inspection, at least initially, was that the burdens and expense of taking the engine out of service and the parties having to attend the inspection outweighed any likely benefit.   BNSF's position from the beginning has been that an inspection is unlikely to provide any useful information regarding the condition of the door at the time of the injury given the immediate post-accident removal of the weather stripping and the continuous use of the engine since that time.

What is of particular concern to the court now, however, in addition to issues of costs and relevancy, is that of time and what impact the inspection will have on the trial date, which has already been postponed once.  There is little time remaining to complete the depositions of the liability expert witnesses and the additional fact discovery that Plaintiff's counsel claims need be completed.  For example, Plaintiff's counsel indicates it is necessary to depose at least two of the three persons who were involved in the inspection and repair of the engine door on February 10, 2004–a subject area that appears to be of much more importance than an inspection of the engine at this late date.   Plaintiff's attorney has also indicted it is necessary to undertake additional

depositions in an attempt to determine the identify of an unknown fact witness who might have knowledge of the condition of the door on the date of the accident.  There may be other discovery that must be completed including updating the damage calculations given the extension in the trial date.

Following the court's conference with the parties in May 2007, the court anticipated, apparently wrongly, that the dispute over the inspection would soon be brought back before the court if the matter was not resolved.  For whatever reason this was not done.  Now time and the remaining amount of discovery to be completed are factors that the court must also consider in addressing Plaintiff's motion to compel and not just the cost and relevancy issues.

The primary purpose that Plaintiff advances now for needing the inspection by Plaintiff's expert is set forth in the affidavit of the expert that has been filed with the court.   The thrust of the affidavit is that Plaintiff's expert desires to inspect to the door to determine whether there were reasons for why the door may not have been operated properly - beyond the rubber seal grabbing and the weather stripping on the door jam having interfered with the operation of the door - that may have been overlooked by BNSF's inspection team on February 10, 2004.

While the court doubts that an examination of the door and engine would reveal any useful information regarding the possibility of other mechanical defects given the length of time that has passed and the continued operation of the engine, the court's primary concern with an inspection for this purpose now is one of time.  It is simply too late for Plaintiff to now be engaging in the discovery and expert disclosure of new liability theories.   If some other mechanical cause for the door sticking was to be identified and become the subject of Plaintiff's expert's testimony, there would have to be an appropriate written disclosure of the expert's findings and conclusions along

with sufficient time for BNSF to investigate and respond with its own expert disclosure[3] and for

BNSF to be able to depose or redepose Plaintiff's expert.  There is no reasonable possibility this

could all be accomplished prior to the current schedule trial date of April 21, 2008,  even if the court

was willing to provide relief from the already expired expert disclosure deadline.

And, in this instance, the court would not allow Plaintiff to supplement it expert witness

disclosure to opine on a new cause for the door sticking.  This case has already been continued once

and Plaintiff's counsel has had more than sufficient time to obtain the necessary inspection despite

any unreasonableness on the part of BNSF in objecting to the inspection.

Logically, an inspection by Plaintiff's expert for the purpose of determining the causes of

the door sticking should have been conducted prior to the expert's written disclosure in April 2007.

 In this case, the court conducted its initial scheduling and discovery conference on May 22, 2006.

Between that date and when Plaintiff disclosed the written report from its liability expert, Plaintiff

had almost one year to obtain the necessary inspection, including making any motion to compel that

was required.  Further, when Plaintiff's counsel did bring the matter to the court's attention in May

2007 and the August 2007 trial date was extended to April 2008, the court at that time, and for a

reasonable time thereafter, likely would have been receptive to a request for additional time for

---

[3]   It may very well be that BNSF would seek to employ new and different types of experts if a new mechanical cause is disclosed.  Although there has been mention of the rubber seal grabbling and the weatherstripping interfering with door, Plaintiff's primary theory of the case is that it does not make any difference what the exact cause of the door sticking was since the mere fact it was excessively sticking according to Plaintiff is sufficient to invoke liability under FELA and that the failure to discover and remedy the condition prior to the accident also amounted to negligence.  And, as a consequence, it appears that BNSF has decided to limit its defense to expert testimony that  a sticking door does not constitute violation of any federal safety regulations and that Plaintiff should have been more careful and testimony and other evidence of the inspections that were made immediately following the injury.  If Plaintiff's expert was to identify some new mechanical cause for the door not operating properly, such as defect in the door latch, for example,  BNSF might very well conclude that it would have to retain additional experts trained in mechanical or forensic engineering, or both.

further investigation and development of expert testimony, including an inspection for that purpose,[4] given the prior demand upon BNSF for the inspection and the fact that there was still time to get the necessary work accomplished.   But no request for relief from the expert disclosure deadlines was made.  In fact, Plaintiff's counsel signed a stipulation after the trial was continued extending the scheduling deadlines that did not encompass a request for additional expert testimony development.

A second reason advanced by Plaintiff's counsel during the most recent telephonic hearing for why an inspection is necessary is to discover whether BNSF has made any subsequent remedial modifications to the door.  Under certain circumstances, evidence of subsequent remedial measures may be admissible and, in any event, is a legitimate area of discovery apart from whether the information is used by Plaintiff's expert.   Plaintiff's counsel conceded, however, that BNSF had been asked in an interrogatory whether there had been any subsequent remedial changes and BNSF stated that none had been made.  Further, BNSF has disclosed a computer printout that summarizes all of the maintenance and repairs that have been made to the engine since the injury and Plaintiff's counsel acknowledged there is nothing in the records that suggests BNSF was being untruthful in its response.

Given this, the necessity of inspecting for subsequent remedial modifications is insufficient to justify the cost and expense of the inspection.  Morever, the time that would be required to arrange for and complete the inspection would be better spent at this point in completing other more productive work that needs to be completed  to get this case ready for trial, including, particularly,

---

[4]  More than likely, the court would have required BNSF to bear the expense of taking the engine out of service, particularly given FELA's remedial purposes.

the depositions of one or more of the persons that conducted the inspection and made the repairs on

February 10, 2004.

The last reason advanced by Plaintiff's counsel for the inspection is the concern that BNSF

would cross-examine and otherwise comment on the fact that Plaintiff's expert had not personally

inspected the door.  BNSF's counsel, however, has agreed not to do either if the court denies

Plaintiff's motion to compel.  Likewise, BNSF's counsel stated that BNSF would be amenable to

language being read to the jury telling them that they should draw no conclusions from the fact that

witnesses for either party have not inspected the door since February 10, 2004.  The court believes

that one or both of these sufficiently alleviates any concern of unfairness along with BNSF's

commitment that neither its expert nor any of its other witnesses have inspected the door post

February 10, 2004, and will not being doing so.

While the foregoing addresses the three reasons advanced by Plaintiff's counsel during the

telephonic hearing, two other items are worthy of note.  First, there is no indication that Plaintiff's

expert needs the inspection to familiarize himself with the operation of the door.  In fact, Plaintiff's

expert, who has substantial railroad experience, demonstrated thorough familiarity with operation

of the door in his expert report when he stated:

> Throughout my 38-year career, I have operated thousands of locomotive cab doors,
> and they typically open and close very easily.  When the cab door handle is
> downward, it causes the latching mechanism to disengage from the strike that is
> mounted adjacent to and outside of the door.  Once the latch is disengaged from the
> strike, the door should swing open freely on its hinges, and much the same as a
> residential door.  However, as addressed in several documents provided for my
> review, the front cab door of BNSF 6787 did not operate as herein described or as
> intended on February 6, 2004.

Second, while Plaintiff's expert stated in his affidavit that the pictures that are presently

available from 2004 are not sufficient to disclose whether there were additional reasons for why the

door may have been sticking, counsel did not state that additional photographs are necessary to effectively present this matter to the jury.  The court notes that BNSF has disclosed the pictures that were taken in 2004. These  photographs depict the door in both its open and closed positions, the door handle, and the door jam, and it appears they would be for the presentation of Plaintiff's case.

Finally, a side issue is whether Plaintiff should be permitted to attend any inspection. Plaintiff has failed to demonstrate to the court's satisfaction a good reason why he needs to be present and court agrees with BNSF that his presence is an unnecessary risk given his claimed disability, even if he was to execute a waiver of liability.

III.    **CONCLUSION AND ORDER**

In conclusion, the court **DENIES** the motion for production and inspection (Doc. No. 21) after balancing all of the considerations, including those of:  cost; time; the lack of a compelling reason for the inspection apart from the discovery of additional reasons for the door sticking, which is now too late and that likely would not be productive in any event; and the fact that BNSF will have no unfair advantage given that its expert and witnesses have not inspected the door since February 10, 2004, and the limitations on questioning that can be imposed and instructions to the jury that can be given.

The denial of Plaintiff's motion to compel, however, is based upon the following:

1.    BNSF shall not be allowed to conduct is own examination of the engine or door for any litigation purpose related to this action and will not be entitled to present witness testimony about any review or inspection of the engine or door that occurred after February 10, 2004.  In addition, BNSF will not be permitted to present or use any

calculations, measurements, or pictures that have not to date been disclosed to Plaintiff.

2. BNSF will not be permitted to question Plaintiff's expert witness about the lack of a personal inspection of the door or otherwise comment on lack of such an inspection to the jury, whether by Plaintiff's expert or Plaintiff's other witnesses.

3. At the request of Plaintiff's counsel, but only if requested by Plaintiff's counsel, the parties will stipulate in writing for presentation to the jury, or the court can instruct in the event the parties cannot agree on the language, that the jury should draw no conclusions about the fact that the witnesses for either party have not inspected the door since February 10, 2004, since such inspection would not likely reveal any useful information - or words to that effect.

If BNSF cannot agree to these conditions, it must make the engine available for inspection at its expense on or before February 8, 2008, with the exact date and location to be worked out by counsel.  Plaintiff will not be permitted to attend the inspection.  Failure on the part of BNSF to make the engine available for inspection shall constitute its agreement to the foregoing.

**IT IS SO ORDERED.**

Dated this 11th day of January, 2008.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge